IN THE CIRCUIT COURT OF CRAIGHEAD COUNTY, ARKANSAS

SAVOIL KING and DOROTHY KING,
for themselves and all Arkansas residents
similarly situated                                                     PLAINTIFFS

v.                        Case No. CV 14-274 (DL)

HOMEWARD RESIDENTIAL, INC.
f/k/a American Home Mortgage
Servicing, Inc., OCWEN LOAN
SERVICING, LLC, and QBE FIRST
INSURANCE AGENCY, INC.                                   DEFENDANT

## CLASS ACTION COMPLAINT

For their Class Action Complaint against Homeward Residential, Inc. f/k/a American Home Mortgage Servicing, Inc. ("Homeward"), Ocwen Loan Servicing, LLC ("Ocwen") and QBE First Insurance Agency, Inc. ("QBE"), Plaintiffs Savoil King and Dorothy King, for themselves and all Arkansas residents similarly situated state:

### Introduction

1. Mortgage loan servicers and lenders force place insurance when a homeowner fails to obtain or keep up insurance coverage on real property that secures a mortgage loan. Typically, if the insurance policy lapses or provides insufficient coverage, the loan servicer has the contractual right to "force place" a new insurance policy on the property and then charge the premiums to the homeowner.

2. But servicers and lenders have entered into exclusive and collusive relationships with certain force-placed insurance providers in order to force homeowners to pay extraordinarily high insurance premiums, which result in unlawful but exceptional profits to both the lenders and servicers and force-placed insurers.

3. As such, these collusive actions cause obvious damage to Plaintiffs and the Arkansans they seek to represent.

4. At least one court has already certified a class of Florida residents against Wells Fargo Bank, N.A. and QBE First Ins. on many of the same practices described here. *See Williams v. Wells Fargo Bank, N.A.*, 280 F.R.D. 665 (S.D. Fla. 2012).

5. In this case, Defendants Homeward and Ocwen forced Plaintiffs to pay for hazard insurance at rates about three times higher than their original insurer's premiums. Plaintiffs bring this action on behalf of themselves and other similarly situated Arkansans to enjoin defendants from further engaging in these illegal practices, recover their damages, costs and attorneys' fees, and further, for punitive damages.

## Parties

6. The Kings are residents of Craighead County, Arkansas.

7. Defendant Homeward Residential, Inc. is a foreign for-profit corporation with its principal place of business at 1525 S. Belt Line Rd., Coppell, Texas 75019. Homeward may be served with process through its registered agent, The Corporation Company, 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201.

Homeward is a non-depository mortgage lender and loan servicer and a wholly owned subsidiary of Ocwen Financial Corporation.

8. Defendant Ocwen Loan Servicing is a foreign limited liability company, with its principal place of business at 1675 Palm Beach Lakes Blvd., West Palm Beach, Florida 33401. Ocwen may be served with process through its registered agent, Corporation Service Company, 300 S. Spring St, 300 Spring Building, Suite 300, Little Rock, Arkansas 72201. Ocwen is a subsidiary of Ocwen Financial Corp., a publicly-traded consumer financial services company and one of the largest mortgage companies in the country. Ocwen is the fourth-largest loan servicer in the country.

9. Together, Homeward and Ocwen are referred to as the "Loan Servicing Defendants" in this complaint.

10. Defendant QBE First Ins. is a foreign for-profit corporation, with its principal place of business at 9800 Muirlands Blvd., Irvine, California 92618. QBE may be served with process through its registered agent, The Corporation Company, 124 West Capitol Ave., Ste., 1900, Little Rock, Arkansas 72201. QBE is a subsidiary of QBE Insurance Group Ltd, a publicly-traded underwriter for general insurance and insurance risks that operates throughout the world.

## Jurisdiction and Venue

11. This Court has subject matter jurisdiction over this action under Ark. Const. amend. 80 § 6(A), which makes vests the trial court with "the original jurisdiction of all justiciable matters not otherwise assigned pursuant to the Arkansas Constitution."

12. This Court has personal jurisdiction over Homeward because it is a foreign for-profit corporation that services Arkansas homeowners' mortgage loans and is registered to do business in Arkansas, which satisfies the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See* Ark. Code Ann. § 16-4-101B.

13. This Court has personal jurisdiction over Ocwen because it is a foreign limited liability company that services Arkansas homeowners' mortgage loans and is registered to do business in Arkansas, which satisfies the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See* Ark. Code Ann. § 16-4-101B.

14. This Court has personal jurisdiction over QBE because it is a foreign for-profit corporation that provided insurance on Arkansas property and is registered to do business in Arkansas, satisfies the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See* Ark. Code Ann. § 16-4-101B.

15. Venue is proper in this Court because Craighead County is where a substantial part of the events and omissions establishing these claims occurred and is where the Kings resided when the events and omissions establishing these claims occurred. *See* Ark. Code Ann. 16-55-213(a)(1), (3)(A).

## Factual Allegations

16. Permitting a lender to forcibly place insurance on a mortgaged property and charge the homeowner for the cost of the premium is not a new concept or undisclosed

to homeowners in their mortgages. A standard form mortgage agreement serviced by the Loan Servicing Defendants includes a provision requiring the property owner to maintain hazard insurance and allows the lender to force-place coverage if the insurance lapses.

17. What homeowners don't know, because it is not disclosed in the mortgage agreements, is that the Loan Servicing Defendants have exclusive arrangements with QBE and its affiliated entities to manipulate the force-placed insurance market and artificially inflate the premiums and then pass the improperly inflated amounts on to the homeowner. The homeowner is then forced to pay the inflated amounts.

18. QBE has exclusive arrangements with the Loan Servicing Defendants to monitor its mortgage portfolio and provide force-placed insurance. The Loan Servicing Defendants receive additional compensation through captive reinsurance arrangements.

19. The scheme works as follows. The Loan Servicing Defendants purchase master or "umbrella" insurance policies that cover its entire portfolio of mortgage loans. In exchange, QBE is given the exclusive right to force insurance on property securing a loan within the portfolio when the homeowner's insurance lapses or the lender determines the homeowner's existing insurance is inadequate. QBE monitors the Loan Servicing Defendants' entire loan portfolio for lapses in homeowners' insurance coverage. Once a lapse is identified, a QBE or an affiliated entity sends notice to the homeowner that insurance will be "purchased" and force-placed if the

voluntary coverage is not continued. If a lapse continues, the insurer notifies the homeowner that insurance is being force-placed at his or her expense.

20. No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property and the premium charge to the homeowner. Often, the insurance lapse is not discovered for months or even years after the fact. Despite the absence of any claim or damage to the property during the period of lapse, retroactive coverage is placed on the property and the homeowner is charged for the "cost" of the past premium.

21. Once coverage is forced on the property, the Loan Servicing Defendants pay the insurer for the premium and then charges the homeowner for the payment, which is deducted from the homeowner's mortgage escrow account or added to the balance of the homeowner's loan. Occasionally, when a homeowner doesn't have an escrow account, an escrow account with a negative balance is created and the homeowner is charged to bring the balance to zero.

22. Upon information and belief, other entities affiliated with the Loan Servicing Defendants share a percentage of these payments with the Loan Servicing Defendants, sometimes in "soft dollar" credits.

23. The money paid back to the Loan Servicing Defendants or other affiliated entities is not given for any services provided by them; it is grease paid to keep the force-placed machine moving. In reality, no work is ever done by the Loan Servicing Defendants or other affiliated entity to procure insurance for that homeowner because

the coverage comes through the master or umbrella policy already in place due to the exclusive relationship already in place. No commission or income is "earned" and, neither the Loan Servicing Defendants nor other affiliated entities incur any costs in relation to force-placed insurance for any homeowner.

24. Under this highly profitable force-placed insurance scheme, the Loan Servicing Defendants are incentivized to purchase and force place insurance policies with artificially inflated premiums on homeowners' properties because the higher the cost of the insurance policy, the higher the kickback.

25. Upon information and belief, QBE enter essentially riskless "captive reinsurance agreements" with the Loan Servicing Defendants to "reinsure" the property insurance force-placed on homeowners. A recent article illustrates how the captive reinsurance agreement works using JPMorgan Chase's program:

> JPMorgan and other mortgage servicers reinsure the property insurance they buy on behalf of the mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements...
>
> Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS...
>
> Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profits, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns.

The DFS Staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market. Further limiting competition are the companies' tendency to file identical rates in many states, Lawsky and his staff argue. J Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, May 18, 2012, available at: http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals-regulator-attack-1049460-1.html.

26. The Loan Servicing Defendants' reinsurance program, like those of other lenders, is a way to funnel profits, in ceded premiums, to the Loan Servicing Defendants' at homeowners' expense. While reinsurance can, and often does, serve a legitimate purpose, here it does not. On information and belief, the Loan Servicing Defendants and other affiliated entities enter into reinsurance agreements with QBE and other QBE entities the insurer will return to Loan Servicing Defendants significant percentages of the premiums charged borrowers by way of ceded reinsurance premiums to the Loan Servicing Defendants or other affiliated entities or subsidiaries. While the Loan Servicing Defendants or other Ocwen entities purportedly provided reinsurance, they assumed no real risk.

27. These unfair, deceptive and unconscionable business practices have come under increased scrutiny in recent years by the government and regulators:

- On March 21, 2013, the New York Department of Financial Services' (NYDFS), investigation into force-placed insurance practices produced a settlement with the country's largest force-placed insurer, Assurant, Inc. The settlement includes restitution for homeowners harmed, a $14 million penalty paid to the State of New York, and industry-leading reforms that will prospectively save homeowners, taxpayers, and investors millions of dollars through lower rates. Under the Consent Order, Assurant and its subsidiaries are prohibited from paying commissions to any servicers or entity affiliated with a

servicer on force-placed insurance policies obtained by the servicer. *See* Consent Order, available at: http://www.dfs.ny.gov/about/press2013/assur-order-130321.pdf

- At NYFDS hearings on May 17, 2012 related to the force-placed insurance market, the Superintendent of Financial Services, Benjamin Lawsky, stated that the Department's initial inquiry uncovered "serious concerns and red flags" including: (1) exponentially higher premiums, (2) extraordinarily low loss ratios, (3) lack of competition in the market, and (4) tight relationships between banks, their subsidiaries, and insurers:

> In sum when you combine [the] close and intricate web of relationships between banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions[.] *See* Hearing Transcript, 9:14-21, available at: http://www.dfs.ny.gov/about/hearings/fp_052012/fp_trans_20120517.pdf

- After August 2012 NAIC hearings, the state regulator from Louisiana, James Donelen, referred to the force-placed insurance market as a "monopoly" and stated that stricter regulations may be needed. *See* Z. Tracker & D. Beasley, *U.S. Regulators to Examine Forced-Place Insurance*. BLOOMBERG BUSINESSWEEK, August 10, 2012, available at: http://www.bloomberg.com/news/2012-08-10/u-s-regulators-to-examine-forced-place-insurance.html

- On December 18, 2013, Fannie Mae issues its Servicing Guide Announcement related to force-placed insurance that prohibits servicers from including any commissions, bonuses, or other incentive compensation in the amounts charged to homeowners for force-placed insurance and requires that the force-placed insurance carrier cannot be an affiliated entity of the servicer. *See* Servicing Guide Announcement, available at: https://www.fanniemae.com/content/announcement/svc1327.pdf

28. The Loan Servicing Defendants also overcharge homeowners by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement

(LLPE) in the standard form mortgage agreement. Either of these clauses typically protects the lender for a period of at least ten days after the termination of the homeowner's voluntary insurance policy. Force-placed policies, however, take effect on the date of termination, and "double-cover" the property unnecessarily during the period covered by the LPPE or Standard Mortgage Clause. This means the borrower is charged for coverage for which the lender or servicer has no exposure.

29. The amounts charged to homeowners are also inflated by the interest that accrues on the amounts owed for force-placed coverage. When the Loan Servicing Defendants add the cost of the high-priced premium to a homeowner's mortgage balance, it increases the interest paid over the life of the loan by the homeowner to the lender.

30. The actions and practices described here are unconscionable, false, deceptive, and undertaken in bad faith with the sole objective to maximize profits. Homeowners straddled with force-placed insurance are charged hyper-inflated and illegitimate noncompetitive premiums due the collusive agreements between Defendants.

31. Homeowners have no say in the selection of the force-placed insurance carrier or the terms of the force-placed insurance policies. Force-placed policies are commercial insurance policies and their terms are determined by the Loan Servicing Defendants and QBE.

32. The Kings do not challenge the Loan Servicing Defendants' right to force place insurance. Instead, they challenge Defendants' manipulation of the force-placed insurance market with an eye toward artificially inflating premiums and placing unnecessary coverage and then unfairly, deceptively, and unconscionable passes on to the borrower. Servicers, like the Loan Servicing Defendants, are financially motivated to utilize the insurer, QBE, which offers it the best financial benefit for "commissions," direct payments, discounted tracking services, or ceded insurance premiums.

33. This class action is brought to put an end to Defendants' exclusive, collusive, and uncompetitive arrangements, and to recover for the Kings and the Class the excess amounts charged to them beyond the true cost of insurance coverage.

**The Kings**

34. The Kings purchased their home at 4103 Cornerstone Dr., Jonesboro, Arkansas through a mortgage and promissory note in 1994.

35. The Kings refinanced through H&R Block Mortgage Corporation in August 2005 and executed another mortgage and promissory note secured by their home.

36. After the 2005 refinancing, the loan servicer did not require the Kings to pay their homeowners' insurance premiums through an escrow account. Instead, the Kings paid their homeowners' insurance premiums directly to their insurer and sent proof to the loan servicer that they had paid their homeowners' insurance premiums.

37. Despite the fact that the Kings already had existing homeowners' insurance in place at the time, in September 2011, Homeward (then known as American Home Mortgage Services, Inc.) force-placed insurance on the Kings home with QBE as the insurer. The force-placed insurance was obtained with the assistance of AHMSI Insurance Agency, Inc.[1], a licensed insurance agency affiliated with American Home Mortgage Servicing, Inc. AHMSI Insurance Agency, Inc. received a commission on the force-placed insurance obtained for the Kings mortgage-loan.

38. The force-placed insurance monthly premium was $255.55 (or $3,066.60 annual premium), which the Loan Servicing Defendants began and continue to charge to the Kings monthly. At that time, the Kings paid a $1,100 annual premium (an approximate $91.67 monthly premium) to Farmers Union Mutual Insurance Company. After learning that Homeward had force-placed insurance on their home and charged them almost triple what they had already paid to Farmers Union Mutual Insurance Company, the Kings again provided proof that they maintained homeowners' insurance on their home.

39. For a period of approximately two years, the Kings were forced to pay the force-placed insurance premiums and the premiums for the homeowners' insurance they had always maintained outside of any escrow account.

---

[1] AHMSI Insurance Agency, Inc. is now known as Belt Line Road Insurance Agency, Inc. and has its principal place of business at 1525 S. Belt Line Road, Coppell Texas 75019.

40. Additionally, upon information and belief, the force-placed insurance policy provided unneeded, retroactive coverage for previous years in which the Kings had no need for insurance coverage.

41. Effective March 1, 2013, Homeward transferred the Kings' mortgage loan servicing to Ocwen Loan Servicing. Eventually, Ocwen Loan Servicing allowed the Kings to drop the unneeded force-placed insurance coverage, but not until the Kings were double-billed and charged an excessively high premium for approximately two years.

## Class Allegations

41. The Kings re-allege and incorporate the foregoing paragraphs, as if set forth word for word.

42. The Class is defined:

> All borrowers that had mortgages with or serviced by the Loan Servicing Defendants, on property located with the State of Arkansas, and who either paid or who still owe, premiums for a force-placed insurance policy in the five years preceding June 5, 2014, except (1) any borrower who has filed a claim for damages based upon similar allegations, (2) any borrower who was provided full credit for all premiums paid for force-place insurance prior to the initiation of this case, and (3) any borrowers employed by any Defendant.

43. The "Class Period" shall include the five years preceding the filing this Class Action Complaint up to and through entry of judgment.

*Typicality/Ascertainability*

44. The Kings' claims are typical of the transactions between Defendants all other Arkansans charged for a force-placed insurance policy.

*Commonality*

45. The Kings' claims raise issues of fact and law, which are common to the members of the putative class. These common questions include, but are not limited to:

   a. Whether Defendants charged homeowners for unnecessary insurance coverage including, but not limited to, insurance coverage that exceeded the amount required by law or the borrowers' mortgages or backdated coverage that covered periods of time for which Defendants had no risk of loss;

   b. Whether Defendants manipulated forced-place mortgage purchases to maximize their profits to the detriment of the Kings and the Class;

   c. Whether the Loan Servicing Defendants or their affiliates perform any work or services for the "commissions" or other "compensation" they collect;

   d. Whether the Loan Servicing Defendants' conduct violates the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et seq.*;

   e. Whether Defendants have been unjustly enriched at the expense of the Kings and the Class;

   f. Whether the Kings and the Class are entitled to damages and injunctive relief because of Defendants' conduct; and,

   g. Whether punitive damages are appropriate and the extent of such punitive damages.

46. These issues are common among all putative class members and predominate over any issues affecting individual members of the putative class.

*Numerosity*

47. The Loan Servicing Defendants are among the largest note mortgage loan servicers in the United States. The Loan Servicing Defendants have retained funds in the form excessive force-placed insurance premiums for several Arkansas homeowners over the last five years.

48. The members of the class are so numerous and scattered throughout Arkansas that joinder of all members is impracticable.

*Superiority*

49. A class action is superior to other available methods of relief for the fair and efficient adjudication of the claims raised.

50. Absent class-action relief, the putative class members would be forced to prosecute hundreds, if not thousands, of similar claims in different jurisdictions and venues throughout Arkansas, which would waste the judicial resources and risk inconsistent outcomes.

51. The prosecution of these claims as a class action will promote judicial economy.

52. The claims raised are well suited for class-action relief.

53. A class action would benefit both the Class and Defendants through a single resolution of similar or identical questions of law or fact.

*Adequacy*

54. The Kings are interested in the outcome of this litigation and understand the importance of adequately representing the Class.

55. The Kings will fairly and adequately protect the interests of the class sought to be certified.

56. Class counsel have experience in class action and complex consumer litigation and are qualified to adequately represent the Class.

57. This case fully satisfies the requirements of Rule 23 of the Arkansas Rules of Civil Procedure and should be certified as a class action.

## Causes of Action

### Count I – Violations of the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et seq.*

58. The Kings, individually and for the Class, re-allege and incorporate the foregoing paragraphs, as if set forth word for word.

59. The Arkansas Deceptive Trade Practices Act (ADTPA), Ark. Code Ann. § 4-88-101, *et seq.*, is designed to protect Arkansans from deceptive, unfair and unconscionable trade practices. It is a remedial statute, which is construed broadly.

60. The practices employed by Defendants in their force-placed insurance scheme subject the Kings and the Class Members to excessively high force-placed insurance premiums. Such charges are unfair and unconscionable under the ADTPA and violate the Act.

61. Defendants engaged in "business, commerce, or trade," within the meaning of Ark. Code Ann. § 4-88-107(a)(10) and are "persons" within the meaning of Ark. Code Ann. § 4-88-102(5).

62. Defendants' violations of the ADTPA resulted in the Kings and the Class Members paying excessively high force-placed insurance premiums to the Loan Servicing Defendants not justified. Defendants' force-placed insurance scheme is unfair, unconscionable, false, and deceptive. The Kings and the Class Members paid money to the Defendants in excessively high force-placed insurance premiums.

63. Defendants' violations of the ADTPA resulted in the Kings and the Class Members paying excessively high force-placed insurance premiums that have yet to be returned. Defendants have no intention of obtaining competitive quotes for the force-placed insurance, but instead relied on illegal arrangements described to pass on the excessively high force-placed insurance premiums to the Kings and the Class.

64. Defendants' violations of the ADTPA were wrongful and caused the Kings and the Class Members to suffer actual damages by paying excessively high force-placed insurance premiums. The Kings and the Class Members are also entitled to their costs and reasonable attorneys' fees under the ADTPA.

### Count II – Unjust Enrichment

65. The Kings, individually and for the Class, re-allege and incorporate the foregoing paragraphs, as if set forth word for word.

66. Defendants received money and profits because of their misleading, false, and deceptive conduct listed above.

67. By engaging in practices that resulted in false, misleading and deceptive statements in charging excessively high force-placed insurance premiums to the Kings and the Class, Defendants received money because of their conduct which is unreasonable and unconscionable to retain. The Kings and the Class Members, therefore, seek the disgorgement of these revenues illegally obtained by Defendants. These revenues have unjustly enriched Defendants and should be returned to the Kings and the Class Members.

### Jury Demand

The Kings and the Class they represent demand a trial by jury.

### Prayer for Relief

The Kings and the Class pray for:

1) An order certifying the claims of the Class under Rule 23 of the Arkansas Rules of Civil Procedure, appointing the Kings as Class Representatives, and their attorneys as Class Counsel;

2) Enjoining Defendants from continuing the acts and practices described;

3) Awarding the Kings and the Class judgment on their claims;

4) Awarding the Kings and the Class their actual and punitive damages, attorney's fees and costs and disgorgement of Defendants' profits as allowed by law;

5) Awarding all other relief the Court finds to be proper and just.

Date: June 5, 2014.

Respectfully Submitted,

*/s/ Scott E. Poynter*

Scott E. Poynter
William T. Crowder
Corey D. McGaha
EMERSON POYNTER LLP
The Rozelle-Murphy House
1501 Scott Street
Little Rock, AR 72202

John G. Emerson
EMERSON POYNTER LLP
830 Apollo Lane
Houston, TX 77058
Phone: (281) 488-8854
Fax: (281) 488-8867

Joel G. Hargis
533 West Washington Ave.
Jonesboro, AR 72401

Kathy A. Cruz
THE CRUZ LAW FIRM
1325 Central Avenue
Hot Springs, AR 71901

Todd Turner
Dan Turner
ARNOLD, BATSON, TURNER &
TURNER, P.A.
501 Crittenden Street

P.O. Box 480
Arkadelphia, AR 71923

*Counsel for Plaintiffs and the Class*